No. 76,608

THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, AS THE GOVERNING BODY OF THE JOHNSON COUNTY UNIFIED WASTEWATER DISTRICTS, *Appellee,* v. ROBERT O. GRANT, JR., *et al., Appellants.*

(954 P.2d 695)

Opinion filed March 6, 1998.

*J. Lawrence Louk,* of Roeland Park, argued the cause and was on the brief for appellants.

*Roger L. Tarbutton,* assistant county counselor, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The Board of County Commissioners of Johnson County, Kansas, (the Board) initiated this action by filing a petition seeking to compel defendants/appellants (property owners) to permit access to the residential properties they own in Johnson County for the purpose of inspection for compliance with a program of removal from private property of drains connected directly to the sanitary sewer line. The district court entered judgment in favor of the Board. The district court approved the Board's application for issuance of an administrative search warrant and

ordered the property owners to allow inspectors to enter their properties. The property owners appeal. The appeal was transferred by the court from the Court of Appeals, pursuant to K.S.A. 20-3018.

The district court made the following findings of fact:

"1. The Board is the governing body of Johnson County, Kansas, with full legislative powers to conduct and administer the affairs of government in the County. The Board, as a part of its governmental functions, operates and is the governing body of the Johnson County Unified Wastewater Districts, the major public sanitary sewer system operating within Johnson County.

"2. The sanitary sewerage system operated by the Board serves as a governmental utility providing service to the public. It serves not only to provide proper transportation and treatment of sanitary wastes but also as an essential element of protecting and preserving the public health and environment.

"3. As a utility, the sanitary sewerage system is available for use by the public and its use is constant and ongoing. The Board regulates the use in order to properly maintain the system for the benefit of the general public, as well as individual users. The operation of public sanitary sewer systems is also regulated by state and federal authorities for similar purposes.

"4. In the mid 1980's the Board initiated exhaustive engineering surveys and studies of the sanitary sewer system within Mission Township Main Sewer District No. 1, Indian Creek Main Sewer District No. 1, and Shawnee and Mission Townships Turkey Creek Main Sewer District No. 1, conducted by its consulting engineers, RJN Environmental Associates, Inc. ('RJN'), to identify factors contributing to backups of sanitary sewage into basements and bypassing of raw wastewater into receiving streams and to devise a cost effective plan to ameliorate such conditions.

"5. Backups of sanitary sewage into basements and bypassing of raw sewage into receiving streams constitute a threat to the public health and environment.

"6. The RJN studies identified infiltration and inflow of storm water and/or groundwater from private sources ('Private I & I') entering the public sanitary sewer system during wet weather conditions (a substantial component of which was found to be derived from interior sources such as foundation drains and sump pits) as a major factor contributing to sewer backups and bypasses within the three main sewer districts and, *inter alia*, recommended disconnection of such sources from the public sanitary sewer system where cost effective to do so.

"7. As a result of these studies, the Board initiated a Private Infiltration and Inflow Removal Program (hereinafter referred to as the 'Private I & I Removal Program') requiring inspection and disconnection of all cost effective private sources of storm water and/or groundwater from the public sanitary sewer system within the three main sewer districts and to implement the Program adopted *A Program for the Reduction of the Number of Private Sector Infiltration and Inflow*

*Sources into the Sanitary Sewer System*, on October 3, 1985, under Resolution No. W.D. 85-96, which was superseded on June 4, 1992, by adoption of the *Johnson County Code of Regulations for Private Infiltration and Inflow, 1992 Edition* (the 'Code'), under Resolution No. W.D. 92-22.

"8. The Code prohibits and requires the permanent disconnection of roof down spouts, interior or exterior foundation drains, areaway drains, etc., from the public sanitary sewer or to a building sewer or building drain connected to the public sanitary sewer.

"9. To verify compliance, Section 3, Article 2, Chapter 3, of the Code authorizes the Administrator of the Unified Wastewater District or other Code Enforcement Officer upon reasonable notice to enter upon and inspect basement plumbing facilities and exterior storm water drainage facilities located upon private property and authorizes issuance of lawful orders or search warrants to compel access or to expose or uncover any construction or sewer use where inspection is hindered or prevented.

"10. Section 2, Article 1, Chapter 6, of the Code, further authorizes the Infiltration and Inflow Planning Coordinator to establish and adopt procedures and guidelines necessary to effectuate and implement the intent, purpose, and technical standards required under the provisions of the Code. *A Private Infiltration and Inflow Removal Program Procedural Manual* (hereinafter referred to as the 'Private I & I Procedural Manual') has been adopted to effectuate and implement the Code. The Private I & I Procedural Manual details the inspection process from the initial contact with the homeowner to completion of the actual field inspection itself. Inspections are clearly limited to basement plumbing facilities and exterior storm water drainage facilities and are completed in the company of the occupant. A simple dye test procedure is required where necessary to confirm the existence of a prohibited connection to the public sanitary sewer system.

"11. Although each Defendant owns an interest in private improvements connected to and utilizing the public sanitary sewer system within the three sewer districts and has been requested to provide access for inspection by Code Enforcement Officers under the Private I & I Removal Program, each has refused to provide access.

"12. Inspection of all properties under the Private I & I Program is further required by the terms of various loan and grant agreements entered into by the Board [with] the Kansas Department of Health and Environment and the United States Environmental Protection Agency in order to obtain financing to pay for improvements to the public sanitary sewer system related to the Program.

"13. As the conditions sought to be ameliorated under the Private I & I Removal Program (backups and bypasses of raw sewage during wet weather conditions) generally result from the cumulative effect of infiltration and inflow contributed by a multitude of prohibited connections (although it is possible for such conditions to result from a single prohibited connection), the Program is designed to remove all prohibited connections to the extent feasible. Thus far approximately 51,000 properties have been inspected, resulting in the disconnection of approx-

imately 15,000 prohibited sources, leaving approximately 50 properties (including the subject properties owned by the Defendants) remaining to be inspected."

The property owners challenge the district court's issuance of an administrative search warrant. The applicable standard of review is well known. This court's review of conclusions of law is unlimited. *Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, Syl. ¶ 1, 938 P.2d 1281 (1997).

Property owners first argue that inspections of their properties would be unreasonable because the goal of the Board is to secure federal grant money rather than to protect public health and safety. In making this argument, they mistake a means for an end and fail to appreciate the dependence of local governmental units on state and federal entities for the financing of public system improvements.

The district court found that inspection of all properties under the Private Infiltration and Inflow Removal Program (Private I & I Removal Program) was necessary to the Board's obtaining "financing to pay for improvements to the public sanitary sewer system related to the Program." These improvements, as found by the district court, included disconnecting private drains from the public sanitary sewer system because they cause and/or contribute to cause a threat to the public health and environment. Thus, the overarching goal is protecting public health and safety, and that goal is served by the Board's qualifying for the financing.

The property owners further question the purpose of the inspections, since the owners represent a very small minority, "nine homes, out of over 51,000 inspected," by their own count, who have refused entry to inspectors. They argue that their small numbers preclude the possibility that any illegal drains on their properties could have a measurable impact on the program. The conclusion they draw from this premise is that they have been targeted and the "requested inspections *are* personal in nature." A similar argument was rejected in *Camara v. Municipal Court*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967), as irrelevant to the question of whether such inspections are reasonable under the Fourth Amendment to the United States Constitution. Further,

this conclusion is not supportable given that the property owners created and now perpetuate their own conspicuous minority status. Moreover, their conclusion is contrary to the trial court's finding that the remaining inspections are necessary under the financing agreements and to ensure effectiveness of the program. Interestingly, in *Camara*, the United States Supreme Court identified several persuasive factors which support the reasonableness of code enforcement programs—one being a long history of judicial and public support. The Court quoted the following from *Frank v. Maryland*, 359 U.S. 360, 372, 3 L. Ed. 2d 877, 79 S. Ct. 804, *reh. denied* 360 U.S. 914 (1959):

" 'The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few. Certainly, the nature of our society has not vitiated the need for inspections first thought necessary 158 years ago, nor has experience revealed any abuse or inroad on freedom in meeting this need by means that history and dominant public opinion have sanctioned.' " 387 U.S. at 537.

An additional persuasive factor was that "the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, [and] they involve a relatively limited invasion of the urban citizen's privacy." 387 U.S. at 537.

Property owners next argue that the Board's regulations regarding the inspection of private residences do not adequately specify the frequency, scope, or manner of the inspections so as to provide a constitutional substitute for probable cause which will support the issuance of an administrative search warrant. Property owners do not build their argument on an analysis of the text of the "regulations." Rather, they make assertions in their brief about what the regulations provide. For authority on the standard of specificity that would constitute a constitutional substitute for probable cause, they cite *Donovan v. Dewey*, 452 U.S. 594, 69 L. Ed. 2d 262, 101 S. Ct. 2534 (1981); *Camara v. Municipal Court*, 387 U.S. 523; and *City of Overland Park v. Niewald*, 20 Kan. App. 2d 909, 893 P.2d 848, *aff'd as modified* 258 Kan. 679, 907 P.2d 885 (1995).

The Fourth Amendment prohibits the issuance of search warrants without probable cause. When the property owners speak of

a substitute for probable cause, they draw on the reasoning of *Camara*. In that case, it was held that Camara had a constitutional right to refuse to allow building inspectors to enter his residence for a routine annual inspection for possible violations of the city's housing code unless they obtained a warrant to search. The Supreme Court distinguished warrants issued for the search of a particular residence for the purpose of locating evidence of criminal activity from administrative warrants issued for routine, nonemergency inspections of residences within an area. The purpose of the routine inspections is to locate and eliminate dangerous conditions rather than to find evidence of crime. With respect to the area inspections, the Court stated:

" '[P]robable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building . . . or the condition of the entire area . . . . The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. . . . Such an approach . . . gives full recognition to the competing public and private interests here at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy." 387 U.S. at 538-39.

In the same spirit, this court views the purpose of enactments requiring inspections as securing for the public at large the benefits of public health, safety, and welfare protection and promotion. 258 Kan. at 686-87 (quoting *Siple v. City of Topeka*, 235 Kan. 167, 679 P.2d 190 [1984]). The phrase "frequency, scope, and manner," which the property owners use, occurs in the Court of Appeals' *Niewald* opinion:

"We are convinced . . . based on the analysis found in *Camara* and *See* [*v. City of Seattle*, 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967)], that the existence of an administrative policy or ordinance which specifies the purpose, frequency, scope, and manner of the inspection provides a constitutional substitute for probable cause that a violation has occurred." 20 Kan. App. 2d at 914-15.

With regard to *Donovan*, 452 U.S. 594, the Court of Appeals stated that its lesson was that "inspections of commercial property may be unreasonable if the inspections are so random, infrequent, or unpredictable that the owner has no real expectation that his or her property will periodically be inspected." 20 Kan. App. 2d at 913.

From a comparison of the property owners' contentions and the case law they rely on, it is evident that they have lost sight of the forest. Where the emphasis in the case law lies in reasonableness and balancing public and private interests, the focus advocated by the property owners is narrowed to the three words used by the Court of Appeals—"frequency, scope, and manner." The Court of Appeals' trilogy was intended to suggest concepts rather than to be an inflexible gauge. As used by the district court, however, the terms bear some relevance to the program at issue. For example, the district court does not treat "frequency" as if repeated, periodic inspections were anticipated for the purpose of locating and eliminating recurring hazardous conditions. The sense in which "frequency" may apply to the Private I & I Removal Program is in follow-up inspections for enforcement purposes, and that is how the district court handled it. "Scope" and "manner," too, are addressed by the district court.

The most fundamental flaw in the property owners' argument is that it is premised on assertions that cannot be reconciled with the district court's observations and determinations. The property owners assert that *"nowhere"* in the documentation presented by the Board "is the 'frequency, scope, and manner' of the inspections spelled out as required by *Niewald*." They further assert:

"*Nowhere* in the Code does it state where the inspection is to take place, i.e. there are no restrictions as to what part of the residence, or 'property' for that matter, the inspection is confined to; in fact, under the Code as written, an inspector can access the attic, bedroom, bathroom—anywhere. Further, the Code does not set forth how the inspection is to be undertaken, i.e. can the inspector dig up the basement floor? Can the inspector excavate around a foundation wall? Under the Code as written, both of these questions are answered in the affirmative."

In addition to the factual determinations that are labeled as findings of fact in the memorandum decision, the district court made

additional determinations that are included among the conclusions of law. In some instances, these determinations arguably involve mixed matters of fact and law. Paragraph "D"exemplifies this point:

"The frequency, scope, and manner of the inspections required under the Private I & I Removal Program fit the purpose and overall goal of the Program and provide a constitutional substitute for 'probable cause' under the *Niewald* decision. The frequency of inspection (the Code allows for both initial inspection and post disconnection follow up inspections) is directly related to the nature of the program and that of the structures to be inspected. The scope of inspection is limited to specific geographic areas where Private I & I entering the public sanitary sewer system during wet weather conditions has been identified as a major factor contributing to the frequency and severity of sewer backups and bypasses. Together, the Code and the Private I & I Procedural Manual reasonably limit the manner in which the inspections are to be conducted by Code Enforcement Officers by defining the specific areas of properties to be inspected (*i.e.*, basement plumbing facilities and exterior storm water drainage facilities) and procedures to be utilized."

The same is true for other conclusions of law reached by the district court:

"A. The Board . . . has a legitimate governmental interest in adopting municipal codes such as those adopted to implement the Private I & I Removal Program designed to prevent, to the extent feasible, sewer backups and bypasses that threaten the public health and environment.

"B. As the searches authorized by the Private I & I Removal Program are intended to enforce compliance with municipal codes adopted to prevent the development of conditions detrimental to the public health and safety, the Board need not prove specific evidence of existing violations, but must demonstrate that the Program qualifies under the *Niewald* decision as a general inspection program based upon reasonable legislative or administrative standards derived from neutral sources.

"C. The evidence produced by the Board at the hearing showed that the individual Defendant's properties were not selected for inspection under the Private I & I Removal Program on an arbitrary basis, but pursuant to a general inspection program based upon reasonable legislative or administrative program standards derived from neutral sources. The testimony of Chris Burns, Sr. Wastewater Engineer, and the RJN studies (the *Collection Transportation System Surveys*) establish that Private I & I entering the public sanitary sewer system was a major factor contributing to sewer backups and bypasses during wet weather conditions in certain areas, and as a consequence, the Private I & I [Removal] Program was adopted requiring inspection of all properties located within such areas connected to the sanitary sewer system, including the properties owned by the Defendants.

Hence, the Program qualifies as a general inspection program based upon reasonable legislative or administrative standards derived from neutral sources under the *Niewald* decision.

. . . .

"E. As the health hazards to be minimized (backups and bypasses during wet weather conditions) by the Private I & I Removal Program were determined to be related to the cumulative effect of multiple private connections contributing infiltration and inflow into the sanitary sewer system, the Program was designed to eliminate all such prohibited connections to the extent feasible. Therefore, inability of the Board to enforce the provisions of the Code against the relatively few properties remaining to be inspected would prevent the Private I & I Removal Program from achieving maximum results, and would jeopardize retention of the benefits thus far achieved."

The property owners' assertions are not supported by record references, and they run counter to the district court's determination of the facts. Their argument has no merit.

The property owners next contend that inspections under the Private I & I Removal Program cannot be undertaken pursuant to an administrative search warrant because of the potential for criminal consequences. In *Camara*, the Supreme Court noted that the Fourth and Fifth Amendments jointly guard the self-protection interests of property owners in the case of a search for evidence of criminal activity. The Court stated: "[A] routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." 387 U.S. at 530. The Court was fully aware, however, that even a routine inspection may "jeopardize 'self-protection' interests of the property owner." 387 U.S. at 531. Out of concern for those interests as well as simple privacy interests, the Court held that Camara had a constitutional right to refuse entry to warrant*less* inspectors. Thus, Camara could not be convicted for refusing to consent to a warrantless inspection. In explaining why a warrant should be obtained by routine inspectors, the Court stated:

"[I]nspections of the kind we are here considering do in fact jeopardize 'self-protection' interests of the property owner. Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second

inspection, again without a warrant. Finally, as this case demonstrates, refusal to permit an inspection is itself a crime, punishable by fine or even by jail sentence." 387 U.S. at 531.

Similarly, in the present case, where storm water drains and sanitary sewer connections are discovered and verified, the inspector is required to issue a disconnect order allowing the homeowner time to either disconnect or appeal as provided by the code. The homeowner is given several options in complying with the disconnect order, including reimbursement of all reasonable expenses of disconnecting. The fact that failure to comply with a disconnect order could result in criminal penalties is not a constitutional obstacle to obtaining an administrative search warrant for routine inspections.

The property owners rely strictly on a passage quoted from an Oregon case by the Kansas Court of Appeals. The case before the Oregon Court of Appeals, *Accident Prevention Division v. Hogan*, 37 Or. App. 251, 586 P.2d 1132 (1978), involved a property owner's challenge of "citations that were issued as a result of the inspection." 20 Kan. App. 2d at 913. According to our Court of Appeals, the Oregon court "ruled that the amount of evidence necessary to show probable cause would depend on the nature of the intrusion and its potential consequences." 20 Kan. App. 2d at 913-14. Thus, the Oregon court devised "a sliding scale of evidence/probable cause." 37 Or. App. at 258. It reasoned that *Camara* did not "abandon the concept of 'probable cause' to support warrants." 37 Or. App. at 257. The Oregon courts, of course, under our federal system must abide by the lower limits established by the United States Supreme Court for protection of individual federal constitutional rights but may enforce greater safeguards as long as they do not conflict with other constitutional considerations. That appears to be what occurred in the Oregon case.

In any event, the property owners have not cited authority that would obligate the court to require more for issuance of an administrative search warrant than has been shown in this case.

Finally, the property owners argue that the only authority available to the district court for issuance of administrative search warrants is K.S.A. 22-2502. We rejected that argument In *City of*

*Overland Park v. Niewald*, 258 Kan. 679, 686, 907 P.2d 885 (1995), stating:

"It therefore follows that the presence of K.S.A. 1994 Supp. 22-2502(a) in the code of criminal procedure does not prevent administrative agencies from making other types of constitutionally permissible searches. The constitutionality of administrative searches within the framework of a warrant procedure has been resolved in *Camara* and *See*. Thus, we are led to conclude that the statute was intended to govern one type of warrant procedure: search warrants to be used in criminal investigations. It does not prohibit issuance of other warrants which comport with the constitutional requirement of reasonableness."

Thus, we made the following modification to the decision of the Court of Appeals:

"We agree that the district court has jurisdiction and authority to issue an administrative search warrant. However, we disagree with the Court of Appeals that K.S.A. 1994 Supp. 22-2502 is applicable to the issuance of an administrative search warrant. We specifically disapprove of the language 'Under the provisions of K.S.A. 1994 Supp. 22-2502,' in Syl. ¶ 6 of the Court of Appeals opinion and the corresponding language in the body of the opinion." 258 Kan. at 687.

Reasonableness is the ultimate standard for determining if probable cause exists for issuing an administrative search warrant for a code enforcement inspection of a dwelling. The inspection contemplated by the Board in enforcing the Johnson County Code of Regulations for Private Infiltration and Inflow is a reasonable search of a dwelling within the meaning of the Fourth Amendment.

The judgment of the district court is affirmed.