(79 P.3d 1081)
No. 88,643

BRENDA WERDANN, *Appellant/Cross-appellee*, v. MEL HAMBELTON FORD, INC., *Appellee/Cross-appellant*, and KEVIN HASSOUNEH, FORD MOTOR CREDIT COMPANY, and BILLY M. JOHNSON, *Defendants*.

Opinion filed November 26, 2003.

*Barry L. Arbuckle,* of Wichita, for appellant/cross-appellee.

*Todd E. Shadid,* of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, for appellee/cross-appellant.

Before ELLIOTT, P.J., MALONE, J., and ROGG, S.J.

MALONE, J.: Brenda Werdann appeals the amount of damages awarded by the trial court for her successful claim of conversion.

She also appeals the trial court's decision granting summary judgment in favor of Mel Hambelton Ford, Inc. (Mel Hambelton) on her federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 (2000) *et seq.,* claim and her federal "Odometer Act" (FOA), 49 U.S.C. § 32701 (2000) *et seq.,* claim. Mel Hambelton cross-appeals, alleging that the trial court erred in assessing punitive damages against Mel Hambelton and in awarding attorney fees to Werdann.

On March 11, 2000, Werdann and her boyfriend, Billy M. Johnson, attended Mel Hambelton's off-site car sale at the Kansas Coliseum. They test drove a green 1998 Ford Windstar with a vehicle identification number (VIN) ending in 25369 (Windstar 25369). Following the test drive, Werdann and Johnson agreed to purchase the van, and Werdann agreed to trade in her Honda Accord as the down payment. She was given a $2,000 credit for the trade-in. All parties agree that the van Werdann and Johnson agreed to purchase was Windstar 25369.

Damian Preston, the salesperson for Mel Hambelton, prepared the initial handwritten sales contract signed by all parties. On this contract, the van was described as a 1998 Ford Windstar with VIN 25369 with 20,696 miles. The purchase price was $18,750.

The stock number on the handwritten sales contract was F9346. This is the crux of the entire lawsuit. Mel Hambelton has asserted throughout the proceedings that the correct stock number for the Windstar purchased by Werdann was actually F9364. Stock number F9346 was actually assigned to a different Ford Windstar with a VIN ending in 33501 (Windstar 33501). Preston acknowledged that he was "rushed" on the day in question and that it was "a very busy day."

After signing the handwritten sales contract, Werdann and Johnson met with a finance officer to complete the retail installment contract and sign a typed version of the sales contract. Mel Hambelton asserted that the finance officer typed the incorrect stock number from the handwritten sales contract into the computer, producing a final sales contract which identified the vehicle being purchased as the Windstar 33501. Werdann did not notice the mistake at the time she signed the final sales contract.

Werdann's purchase was financed through Ford Motor Credit Company. The typed retail installment contract, which Werdann received at the time of the sale, contained a section entitled Federal Truth in Lending Disclosures. Werdann also acknowledged that Mel Hambelton provided an odometer disclosure statement which accurately reflected the number of miles on Windstar 25369.

Werdann drove home in the van she test drove, Windstar 25369. Windstar 33501 was a more expensive model with a larger engine and other accessories. The suggested retail price of Windstar 33501 was $26,445, and the suggested retail price of Windstar 25369 was $24,385.

A few days after taking the van home, Werdann received a phone call from Preston. According to Werdann, Preston told her that he had made a mistake and that the van taken home by her cost $4,000 more than it was sold for. In order to correct this mistake, Werdann testified that Preston told her to "either bring the van in; take the other van or redo the paperwork." Werdann never asked anyone at Mel Hambelton if redoing the paperwork would result in any additional costs.

Throughout March, Werdann continued to receive calls from Preston and from Kevin Hassouneh, the used car sales manager, asking her to bring the van back to Mel Hambelton. Werdann testified that both employees called her repeatedly and threatened to come to her apartment to take the van. Werdann testified that she asked Preston to "change the paperwork." At approximately the same time, Werdann ended her relationship with Johnson. On March 21, 2000, Johnson received the title to Windstar 33501, the one that was not purchased. Mel Hambelton never delivered a title to Windstar 25369 to either Werdann or Johnson.

Following her breakup with Johnson, Werdann needed to get a less expensive vehicle. She returned to Mel Hambelton on April 17, 2000, with Windstar 25369. She testified that her intention in returning to Mel Hambelton was to "get a rescission" of the contract, and she expected to receive $2,000, the amount of her trade-in in return. Werdann met with Hassouneh and asked for a rescission of the contract. Hassouneh refused to return Werdann's money. Instead, he offered Werdann the keys to Windstar 33501

and requested that she turn over the keys to Windstar 25369. Hassouneh also had her van blocked in by placing a large truck behind Windstar 25369. When Werdann refused to turn over her keys, Hassouneh threatened to call the police. Eventually, Werdann handed over the keys to Windstar 25369. She called her mother to pick her up from Mel Hambelton, and she testified that she was very upset by the entire incident.

Werdann never received back her Honda Accord, which was used as the trade-in, or its $2,000 value. She also never made any payments to Ford Motor Credit Company pursuant to the installment contract. Mel Hambelton ultimately sold Windstar 25369 for $10,510 and initially retained the money. In the meantime, Ford Motor Credit Company began making demands upon Werdann for the balance due under the contract. After intervention by the Consumer Protection Office of the Sedgwick County District Attorney's office, Mel Hambelton applied the proceeds from the sale of Windstar 25369 to the purchase contract and Ford Motor Credit Company agreed not to pursue Werdann for the balance.

On November 16, 2000, Werdann filed a petition against Mel Hambelton in Sedgwick County District Court. Werdann asserted numerous claims, including damages for conversion, violations of TILA, FOA, and the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, and also punitive damages and attorney fees. The trial court granted summary judgment in favor of Mel Hambelton on Werdann's TILA claim and her FOA claim. The trial court also granted Werdann's motion for partial summary judgment that Mel Hambelton was liable for conversion. The case proceeded to a bench trial on damages on the conversion claim.

After a bench trial, the trial court awarded Werdann $2,000 on her conversion claim, representing the value of her trade-in/down payment. The trial court found that title to Windstar 25369 had not been delivered to Werdann within 30 days of her purchase, causing the sale to become void pursuant to K.S.A. 2002 Supp. 8-135(c)(7). Because the sale was void, the trial court reasoned that the actual conversion occurred when Mel Hambelton refused to return Werdann's down payment.

The trial court also found that Mel Hambelton violated the KCPA by committing unconscionable acts and practices separate and apart from the tort of conversion. The trial court awarded a $5,000 civil penalty and the recovery of attorney fees as contemplated by the KCPA. The trial court also found that Hassouneh acted with malice toward Werdann and that Mel Hambelton ratified this conduct. Accordingly, the trial court determined that Mel Hambelton was liable for punitive damages.

After a separate hearing on the issue of attorney fees and punitive damages, the trial court assessed punitive damages in the amount of $17,500 and awarded Werdann attorney fees in the amount of $17,531.25. Finally, the trial court opted to award Werdann the civil penalty of $5,000 on her KCPA claim rather than the $2,000 judgment for conversion. The total award was $40,031.25. Both parties filed a timely appeal.

*Measure of damages for conversion*

Werdann first claims that the trial court applied the wrong measure of damages for her conversion claim. This is a question of law, and our review is unlimited. *Board of Johnson County Comm'rs v. Grant*, 264 Kan. 58, 61, 954 P.2d 695 (1998).

Conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights. [Citation omitted.]" *Gillispie v. Seymour*, 14 Kan. App. 2d 563, 571-72, 796 P.2d 1060 (1990). Under Kansas law, the general rule is that the measure of damages based upon a claim for conversion is the fair and reasonable market value of the property converted at the time of the conversion. *Mohr v. State Bank of Stanley*, 241 Kan. 42, 55, 734 P.2d 1071 (1987).

Werdann contends that Mel Hambelton converted Windstar 25369 on April 17, 2000. Since Werdann believed the van to be worth $18,000 on that date, she claims that the trial court erred in failing to award her $18,000 in damages for her claim of conversion. This position, however, ignores the application of K.S.A. 2002 Supp. 8-135(c)(7).

K.S.A. 2002 Supp. 8-135(c)(7) requires the delivery of a vehicle title "within 30 days" after the vehicle's delivery. Failure to deliver the vehicle's title within the allotted time period results in the sale becoming "fraudulent and void." K.S.A. 2002 Supp. 8-135(c)(7). It is uncontroverted that Mel Hambelton did not deliver title to Windstar 25369 within 30 days of delivery. Therefore, when Werdann returned to Mel Hambelton on April 17, 2000, the sale had already become void. When a car sale becomes void through the operation of K.S.A. 2002 Supp. 8-135(c)(7), the title remains with the seller. *Perry v. Goff Motors, Inc.*, 12 Kan. App. 2d 139, 144, 736 P.2d 949 (1987).

Werdann attempts to define the parties' contract solely through the application of K.S.A. 84-2-401 of the Uniform Commercial Code (UCC). Mel Hambelton correctly points out on appeal that the application of K.S.A. 84-2-401 does not necessarily conflict with the provisions of K.S.A. 2002 Supp. 8-135(c)(7).

Under the UCC, the legal title to Windstar 25369 passed to Werdann on the date the van was delivered "even though a document of title is to be delivered at a different time and place." K.S.A. 84-2-401(2). Mel Hambelton does not attempt to dispute that Werdann held legal title to Windstar 25369 on March 11, 2000. However, after 30 days had passed without the title being delivered, K.S.A. 2002 Supp. 8-135(c)(7) operates to void the sale. Therefore, on April 10, 2000, the sale of Windstar 25369 became void and legal title rested with Mel Hambelton.

When Werdann arrived at Mel Hambelton on April 17, 2002, seeking a rescission of the contract, she no longer held title to the van. However, since the previous sale was now void, she was entitled to the return of her down payment. In fact, Werdann testified that she walked into Mel Hambelton on April 17, 2000, "expecting $2,000 back," the amount of her down payment/trade-in.

Thus, the trial court was correct in determining that the actual conversion occurred when Mel Hambelton refused to return Werdann's down payment. On April 17, 2002, Mel Hambelton held legal title to Windstar 25369, and Werdann was entitled to receive exactly what she requested, the return of her $2,000 down pay-

ment. The trial court's decision to award $2,000 for the conversion claim should be upheld for this reason.

Even if we accept Werdann's argument that Mel Hambelton converted the Windstar and not the down payment, Werdann should only be entitled to recover her *interest* in the van. This is represented by the fair market value of the van offset by any debt owed against it. Here, Werdann's equity in the van was $2,000, and this was a fair recovery for the conversion of the van. This has been determined to be the appropriate measure of damages for conversion in a mortgagor/mortgagee situation. See *Stewart v. Bank*, 110 Kan. 82, Syl. ¶ 2, 202 Pac. 623 (1921); *Boam v. Cohen*, 94 Kan. 42, Syl. ¶ 2, 145 Pac. 559 (1915).

Here, Werdann's debt to Ford Motor Credit Company was completely discharged. Allowing Werdann to recover the full fair market value of Windstar 25369, approximately $18,750, without reduction for the debt she initially owed against it, would clearly have been granting Werdann a windfall. The basic principle of damages is to make a party whole by putting the party back in the same position, not to grant a windfall. *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan. App. 2d 662, 679, 588 P.2d 463 (1978). Regardless of which approach is taken, the $2,000 in damages awarded to Werdann for her conversion claim was fair and equitable.

## Truth in Lending Act claim

Next, Werdann claims the trial court erred in granting summary judgment on her TILA claim.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

Werdann alleges that Mel Hambelton violated TILA when it "did not provide written TILA disclosures to plaintiff in a form she could keep prior to consummation of extension of credit." She claims that Mel Hambelton was required to give Werdann "a physical copy of the written TILA disclosures in a form that can be kept *prior* to the consumer's signing the credit contract."

Since this particular transaction would be considered a closed-end credit transaction, the relevant portion of TILA is 15 U.S.C. § 1638(b)(1) (2000), which provides: "[T]he disclosures required [by TILA] shall be made before the credit is extended." Furthermore, Regulation Z, see 12 C.F.R. § 226.1 (2003) *et seq.*, promulgated pursuant to the Federal Reserve Board's authority under TILA provides:

"(a) *Form of disclosures*. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else . . . .

. . . .

"(b) *Time of disclosures*. The creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17 (2003).

Consummation of a credit transaction occurs when the consumer becomes contractually obligated on the credit transaction. See 12 C.F.R. § 226.2(a)(13) (2003). As such, Werdann became contractually obligated on the credit transaction when she signed the contract.

TILA is to be broadly construed to provide protection for the consumer. See 15 U.S.C. § 1601(a) (2000) *et seq.* Thus, a failure to properly disclose information as required by TILA or Regulation Z results in a technical violation. See *Walters v. First State Bank*, 134 F. Supp. 2d 778, 780 (W.D. Va. 2001).

It is undisputed that the retail installment contract signed by Werdann included the required TILA disclosures. Indeed, the retail installment contract contains a section entitled Federal Truth in Lending Disclosures which Werdann signed. The point of contention arises over whether Mel Hambelton was required to give Werdann a physical copy of the written TILA disclosures prior to her signing the credit contract. In other words, was it a violation

of TILA to not provide Werdann with a separate TILA disclosure document?

· This court has addressed this exact issue in *Queen v. Lynch Jewelers, LLC*, 30 Kan. App. 2d 1026, 55 P.3d 914, *rev. denied* 275 Kan. 965 (2002). In *Queen*, this court held:

> "A creditor complies with the disclosure requirements of the Federal Truth in Lending Act, 15 U.S.C. § 1601 (2000) *et seq.*, when the creditor presents a credit contract containing the required disclosures to the consumer before consummation of a credit transaction in a form that the consumer can keep. *A creditor is not required to provide the consumer with a written copy of the disclosures separate from other copies of a multiple copy credit contract before the consumer signs the contract.*" (Emphasis added.) 30 Kan. App. 2d 1026, Syl. ¶ 1.

Therefore, Mel Hambelton was not required to provide Werdann with multiple TILA disclosures. TILA disclosures included in the retail installment contract satisfied the statutory requirements and, pursuant to *Queen*, there was no need for Mel Hambelton to give Werdann a separate TILA disclosure document before she signed the installment contract.

Werdann acknowledges that her case is indistinguishable from *Queen*. However, she argues that *Queen* was wrongly decided and should not be followed. We believe the court's reasoning in *Queen* was sound, and we follow the holding in that case. Accordingly, the trial court was correct in granting summary judgment on Werdann's TILA claim.

### Federal Odometer Act claim

Next, Werdann claims the trial court erred in granting summary judgment on her FOA claim. The standard of appellate review of a trial court's grant of summary judgment was set forth in the prior section of this opinion. See *Bracken*, 272 Kan. at 1274-75.

Werdann bases her FOA claim on 49 U.S.C. § 32705(b)(1) (2000) which requires a vehicle transferor to accurately disclose the mileage of the vehicle on the title document. Werdann acknowledges that Mel Hambelton provided an accurate odometer disclosure statement at the time of delivery, but she insists that the FOA was violated because the odometer reading was not placed on the title but was instead provided as a separate document. Wer-

dann makes no claim that she was in any way misled or suffered any damage as a result of the alleged FOA violation.

Werdann's FOA claim was properly dismissed on summary judgment for the following reason: The FOA does not require the seller to deliver the title at the time of delivery. Pursuant to K.S.A. 2002 Supp. 8-135(c)(7), however, Mel Hambelton had 30 days in which to deliver the title to Werdann; when Mel Hambelton failed to deliver the title the transaction became void. Since the transaction was void, and no title was ever transferred to Werdann for Windstar 25369, the FOA was not applicable because Mel Hambelton never provided the title with, or without, the correct mileage for Windstar 25369.

Also, Werdann's FOA claim should fail due to her inability to produce any evidence that Mel Hambelton had an "intent to defraud." *Suiter v. Mitchell Motor Coach Sales, Inc.*, 151 F.3d 1275 (10th Cir. 1998). In *Suiter*, the Tenth Circuit Court of Appeals held that the "intent to defraud" standard of FOA was higher than a mere negligence standard but could be proven if the transferor exhibits a "reckless disregard for the truth." 151 F.3d 1282. The *Suiter* court held: "A transferor of a vehicle may be found to have intended to defraud if he has reason to know the mileage on the vehicle was more than was reflected by the odometer . . . and nevertheless failed to take reasonable steps to determine the actual mileage." 151 F.3d 1282 (citing to *Haynes v. Manning*, 917 F.2d 450, 453 [10th Cir. 1990]).

Werdann claims that "intent may be inferred from the facts"; however, the facts show no evidence of an intent to defraud. It is undisputed that the mileage disclosure statement provided by Mel Hambelton was completely accurate. For these reasons, the trial court was correct in granting summary judgment on Werdann's FOA claim.

*Punitive damages*

Mel Hambelton cross-appeals, claiming that the trial court erred in assessing punitive damages against it, *i.e.*, the corporation. Mel Hambelton claims that Hassouneh did not act with malice toward

Werdann and, even if he did, Mel Hambelton never ratified the conduct.

An appellate court must first determine whether the trial court applied the provisions of K.S.A. 60-3702 in setting the amount of punitive damages. "Once that determination has been made, the amount awarded will be set aside only upon a showing that the trial court abused its discretion, which is another way of saying that the action of the trial court was arbitrary, capricious, or unreasonable." *Reeves v. Carlson*, 266 Kan. 310, 316, 969 P.2d 252 (1998).

K.S.A. 60-3702(c) requires the plaintiff requesting punitive damages to prove "by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." K.S.A. 60-3702(d)(1) limits an employer's liability for punitive damages for its employees' conduct to those cases in which the employer authorized or ratified the employees' conduct.

Here, the trial court found that Hassouneh acted with malice toward Werdann. Malice is defined as a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse. See Black's Law Dictionary 968 (7th ed. 1999). Existence of malice is ordinarily a question of fact, unless the evidence is undisputed. *Messinger v. Fulton*, 173 Kan. 851, 855, 252 P.2d 904 (1953).

Werdann's version of the events of April 17, 2000, is considerably different from Mel Hambelton's version. There is considerable evidence, considered in a light most favorable to Werdann, which supports a finding that Hassouneh acted maliciously toward Werdann that day. According to Werdann, Hassouneh blocked and seized Werdann's van when she attempted to rescind the contract. Hassouneh refused to return Werdann's $2,000 down payment, and he threatened to call the police if Werdann refused to hand over the keys to the van. Werdann had to call her mother to obtain a ride home from Mel Hambelton, and she was visibly shaken by the incident.

If Hassouneh had simply examined the handwritten sales contract, he would have seen that it contained the correct VIN of the van which Werdann had negotiated to purchase and which she had

taken home. At trial, Karen Clothier, Mel Hambelton's comptroller, testified that she felt the entire incident was "mismanaged."

On appeal, Mel Hambelton attempts to mitigate Hassouneh's actions by noting that "Hassouneh never forcibly took or attempted to take the keys from Werdann." The fact that Hassouneh did not physically attack Werdann in order to get the keys does nothing to minimize the malicious conduct of blocking in Windstar 25369 and refusing to return the down payment.

Mel Hambelton wants this court to reweigh the evidence regarding Hassouneh's conduct. We decline to do so and uphold the trial court's finding that Hassouneh acted maliciously toward Werdann.

We also agree the evidence supports the trial court's finding that Mel Hambelton ratified the conduct of its employee. Ratification, under the punitive damages statute, may be either express or implied and may be accomplished before, during, or after the employees' questioned conduct. It may be based on an express ratification or based on a course of conduct indicating the approval, sanctioning, or confirmation of the questioned conduct. *Smith v. Printup*, 254 Kan. 315, 342, 866 P.2d 985 (1993).

Here, no disciplinary action was ever taken against Hassouneh. Failure to discipline an employee for wrongful conduct can be considered as evidence of ratification by the employer. 254 Kan. at 340; *Foley Co. v. Scottsdale Ins. Co.*, 28 Kan. App. 2d 219, 223-24, 15 P.3d 353 (2002).

Additionally, Mel Hambelton's actions in selling Windstar 25369 and initially keeping the proceeds can be viewed as ratification of Hassouneh's conduct. Mel Hambelton sold the van taken from Werdann at a "dealer auto auction" for $10,510, but none of this money was used to reduce the debt Werdann owed to Ford Motor Credit Company until the Consumer Protection Office of the Sedgwick County District Attorney's office intervened in the case. Allowing Werdann to appear to be deficient in her payments and failing to apply the money recovered from the sale of Windstar 25369 was a ratification of Hassouneh's malicious conduct.

It cannot be said that the trial court abused its discretion in determining that Hassouneh acted with malice and that Mel Ham-

belton ratified its employee's conduct. Accordingly, the trial court did not err in assessing punitive damages against Mel Hambelton.

## Attorney fees

Finally, Mel Hambelton claims the trial court erred in awarding attorney fees to Werdann. Specifically, Mel Hambelton claims that Werdann failed to segregate her attorney fees as to her different causes of action so that the trial court could award attorney fees to Werdann based only on the KCPA claim.

"The assessment of costs and attorney fees lies within the sound discretion of the trial court, and its determination will not be reversed on appeal absent a showing of an abuse of discretion. If any reasonable person would agree with the trial court's decision, appellate courts will not disturb the trial court's decision." *Horsch v. Terminix Int'l Co.*, 19 Kan. App. 2d 134, Syl. ¶ 7, 865 P.2d 1044 (1993), *rev. denied*, 254 Kan. 1007 (1994).

The attorney fees awarded in this case were made pursuant to Werdann's successful KCPA claim. The trial court originally requested Werdann to segregate her attorney fees as to the amount incurred on the KCPA claim as opposed to her other causes of action. Werdann failed to do so. Nevertheless, the trial court awarded Werdann $17,531.25, representing the full amount of her attorney fees incurred in the case.

"In a lawsuit involving multiple claims or multiple theories, an award of attorney fees must be based on the time spent by the prevailing party's attorney on the claim or theory under which attorney fees are allowable. Where several causes of action are joined and only some of them permit the award of attorney fees, the prevailing party's attorney is under a duty to segregate the work on several causes in determining an attorney fee award." *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, Syl. ¶ 1, 947 P.2d 1039 (1997).

"An exception to the duty of a prevailing party's attorney to segregate work on several causes of action arises when the attorney fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and, thus, are intertwined to the point of being inseparable, the parties suing for attorney fees may recover the entire amount covering all claims." 24 Kan. App. 542, Syl. ¶ 2.

Here, Werdann never claimed that it was impossible for her to segregate her attorney fees as to her different causes of action. Initially, the trial court correctly determined that Werdann should segregate her fees, but the trial court did not enforce this order. Only Werdann's successful KCPA claim warrants the award of attorney fees.

In awarding Werdann the full amount of her attorney fees, the trial court rationalized that it would have increased the punitive damages award by whatever amount it was required to reduce the attorney fees had Werdann actually segregated her fees. Although we question the trial court's "dollar-for-dollar" approach, we recognize that in fixing an award of punitive damages, a trial court may consider the plaintiff's probable litigation expenses, including attorney fees. *Henderson v. Hassur*, 225 Kan. 678, 694, 594 P.2d 650 (1979); *Ayers v. Christiansen*, 222 Kan. 225, 229, 564 P.2d 458 (1977); *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, 98-99, 434 P.2d 828 (1967); *Slough v. J. I. Case Co.*, 8 Kan. App. 2d 104, 111, 650 P.2d 729, *rev. denied* 232 Kan. 876 (1982). Thus, the amount of Werdann's unrecovered attorney fees may have been a factor for consideration, along with other appropriate factors, in arriving at a proper award of punitive damages.

This case is remanded to district court for a hearing to determine the correct award of attorney fees. Werdann is required to segregate her claim for attorney fees so as to reflect the amount of fees incurred in pursuing her KCPA claim as opposed to her different causes of action. The trial court will then determine the reasonableness of her claim. If Werdann fails to properly segregate her claim of attorney fees, she will not be entitled to recover any attorney fees.

Furthermore, in light of the trial court's comments linking attorney fees and punitive damages, the trial court may also reconsider the amount of the punitive damages awarded in this case. Any modification by the trial court of the punitive damages award must be supported by specific findings on the record.

Affirmed in part, reversed in part, and remanded for hearing on attorney fees and punitive damages.