(55 P.3d 914)
No. 87,151

TRAVIS QUEEN, *Appellant*, v. LYNCH JEWELERS, LLC,
and JAMES LYNCH, *Appellees*.

Opinion filed September 13, 2002.

*Barry L. Arbuckle*, of Wichita, for appellant.

*Stanford J. Smith, Jr.*, and *Teresa L. Mah*, of Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., of Wichita, for appellees.

Before GREEN, P.J., WAHL, S.J., AND JOHN J. BUKATY, JR., District Judge, assigned.

GREEN, J.: Travis Queen appeals the dismissal of his claims against Lynch Jewelers, LLC, and James Lynch for conversion and for violations of the Federal Truth in Lending Act (TILA) and the Kansas Consumer Protection Act (KCPA). We affirm.

On January 27, 2000, Travis Queen shopped for a diamond engagement ring at Lynch Jewelers, a jewelry store in Wichita, Kansas. Queen selected a loose diamond weighing 1.03 carats and a

semimount diamond setting as an engagement ring for his girlfriend, Shannon Ham. The purchase totaled $6,142.20.

Lynch Jewelers arranged for Beneficial Credit Services Corporation (Beneficial) to finance Queen's purchase. Queen attempted to finance the entire amount of his purchase, but was only approved to finance $2,500 through Beneficial. Lynch Jewelers made arrangements to accept Queen's down payment of $1,000 and extended an oral, interest-free loan covering the remainder of the purchase price. The interest-free loan is not at issue in the instant appeal.

The $2,500 financed through Beneficial was initially memorialized in a January 27, 2000, installment contract filled out by James Lynch, an employee of Lynch Jewelers. The January 27, 2000, installment contract indicated that the annual percentage rate of interest (APR) for this transaction was 18.29%, resulting in a $767 finance charge and total payments of $3,267 over the 36-month repayment period. Each of these terms was stated in the contract. James Lynch arrived at the 18.29% interest rate after checking the "red book," a resource given to Lynch Jewelers by Beneficial. The red book contains tables of mathematical calculations which are used to determine the monthly total of payments, the finance charge, and the APR for loans assigned to Beneficial.

James Lynch filled out the January 27, 2000, installment contract in Queen's presence. James Lynch reviewed the credit terms, including the APR, finance charge, amount financed, total payments, and total sales price with Queen before asking Queen to execute the installment agreement. Queen testified that after the January 27, 2000, installment agreement was filled out, he was neither confused nor misled by its terms. After reading the installment contract, Queen signed it, and James Lynch removed the top copy of the contract marked "Buyer 1's copy" and gave it to Queen. Queen did not receive a separate copy of the credit disclosures before signing the contract.

Beneficial did not accept assignment of the January 27, 2000, installment agreement because the applicable APR had increased to 21%. This change in the APR caused corresponding changes to

the finance charge, total payments, and the total sales price on Queen's installment contract.

Queen returned to Lynch Jewelers on February 1, 2000, to relay Ham's ring size. Mary Ellen Lynch, an employee of Lynch Jewelers, assisted Queen during this visit. Queen testified that Mary Ellen Lynch told him that James Lynch had made a mistake on the first contract and that he would need to sign a second one. Queen testified that Mary Ellen Lynch retrieved a retail installment contract from a drawer. This document had been completely filled out in typewriting and was dated February 1, 2000. The February 1, 2000, installment agreement disclosed the APR as 21%, with finance charges totaling $890.84. The second installment agreement also reflected appropriate changes to the total sales price and the monthly payments. All other terms remained the same.

Mary Ellen Lynch told Queen that his monthly payments increased to $94.19, but did not explain that the payments increased because James Lynch inadvertently listed the wrong APR on the first contract. Queen reviewed the new contract and executed it. Mary Ellen Lynch gave Queen his copy of the second agreement after he signed it. Queen did not receive a separate copy of the second retail installment agreement before signing it. Beneficial accepted assignment of the February 1, 2000, installment agreement.

Queen picked up the ring from Lynch Jewelers on February 10, 2000, and gave it to Ham on February 20, 2000. On March 20, 2000, while visiting her mother in Nebraska, Ham noticed that the center stone was missing from the band and located it a few feet from where she had been sitting. The next day, Queen and Ham looked at the band and stone under a jeweler's microscope and observed that none of the band's retaining prongs were bent, broken, or missing and saw no chips in the diamond.

On March 24, 2000, Queen returned to Wichita and examined the stone under two other jeweler's microscopes. The stone and band were also examined by a certified diamondologist, who did not observe any chip in the stone or unusual abrasion on the band.

Later that day, Queen took the band and stone to Lynch Jewelers and questioned why the solitaire dislodged from the setting.

Lynch Jewelers requested a chance to repair the ring, but Queen said that he would have to discuss that option with Ham. Queen told Lynch Jewelers that he would call them that same evening with his final decision and left the ring at the store. After discussing the issue with Ham, Queen called Lynch Jewelers that evening and demanded a return of his money. James Lynch told Queen that the diamond was chipped and that there was an abrasion to the band.

On March 25, 2000, Queen hand delivered a memorandum to Lynch Jewelers wherein he rescinded the purchase and demanded a refund. Lynch Jewelers refused to refund the money Queen had paid on the ring. In addition, James Lynch told Queen that he would not get the ring back until it was paid off. On March 27, 2000, James Lynch and John Lynch, another Lynch Jewelers employee, sent a signed letter to Queen wherein they stated that Queen would have to pay his account in full before the ring would be returned to him. Lynch Jewelers repaired the ring by removing scratches from the band, removing a chip from the center stone, and resetting the stone into the band.

Queen brought suit against Lynch Jewelers and James Lynch (collectively referred to as the defendants), wherein he asserted several grounds for relief. Specifically, the claims brought by Queen against the defendants were revocation of acceptance, fraud, conversion, and violations of the KCPA and the TILA. Before trial, Queen moved for summary judgment on his conversion claim and on the TILA violation. The defendants also moved for summary judgment on Queen's claims for the KCPA violation, conversion, fraud, and the TILA violation. The trial court denied Queen's motion for summary judgment and granted the defendants' motion for summary judgment on the conversion, fraud, and KCPA claims.

After hearing the evidence at trial, the trial court granted a directed verdict against Queen on his TILA claim. As such, the only claim submitted to the jury was revocation of acceptance. The jury found that Lynch Jewelers breached its contract with Queen and

awarded him damages in the amount of $4,507.84, the total amount he paid for the ring to the date of trial.

*Federal Truth in Lending Act*

Queen's first argument on appeal is that Lynch Jewelers violated the TILA by failing to provide him with written TILA disclosures before consummation of the installment contract. Queen claims that Lynch Jewelers' failure to provide separate TILA disclosures violated the TILA and required reversal of the directed verdict granted to Lynch Jewelers and entry of summary judgment on his behalf.

" 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict.' [Citation omitted.]" *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 202, 4 P.3d 1149 (2000).

Determination of whether the trial court erred in granting a directed verdict against Queen on his TILA claim requires interpretation of the TILA. Interpretation of a statute is a question of law, and our review is unlimited. This court is not bound by the trial court's interpretation of the statute. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

The purpose of the TILA, 15 U.S.C. § 1601 (2000) *et seq.*, is "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a) (2000). To that end, the TILA mandates that creditors make specific disclosures when extending credit to consumers. See 15 U.S.C. § 1638(a) (2000). These disclosures include the identity of the creditor, the amount financed, the finance charge, and the total number of payments. 15 U.S.C. § 1638(a). It has been said that the TILA changed the philosophy of "let the buyer beware" to "let the seller disclose." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 377, 36 L. Ed. 2d 318, 93 S. Ct. 1652 (1973).

When Congress enacted the TILA, it gave the Federal Reserve Board paramount authority to implement and interpret the Act. The Board's power to prescribe regulations is extremely broad. Congress explicitly stated that the Board's regulations "may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper" to effectuate the purposes of the Act or facilitate compliance with the Act. 15 U.S.C. § 1604 (2000). In addition to giving the Board broad regulatory powers, Congress provided in the Act itself that the disclosures required by the Act are to be made in accordance with the regulations of the Board. 15 U.S.C. § 1631 (2000). Moreover, Congress has indicated that the Board's interpretations should be deferred to by the court. *Super Chief Credit Union v. Gilchrist*, 232 Kan. 40, 43-44, 653 P.2d 117 (1982); see 15 U.S.C. § 1640(f).

For the purpose of this appeal, the relevant portion of the TILA is 15 U.S.C. § 1638(b)(1) (2000), which governs the form and time of disclosures for closed-end credit transactions. The statute provides that "the disclosures required [by the TILA] shall be made before the credit is extended." 15 U.S.C. § 1638(b)(1). Also important is Regulation Z, 12 C.F.R. § 226.1 (2000) *et seq.*, promulgated pursuant to the Federal Reserve Board's authority under the TILA. Regulation Z provides in pertinent part:

"(a) *Form of disclosures.* (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else . . . .

. . . .

"(b) *Time of disclosures.* The creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17 (2002).

Consummation of a credit transaction occurs when the consumer becomes contractually obligated on the credit transaction. See 12 C.F.R. § 226.2(a)(13) (2002). Queen became contractually obligated on the credit transaction when he signed the contract. Queen is a consumer as defined by 15 U.S.C. § 1602(h) (2000),

and Lynch Jewelers is a creditor as defined by 15 U.S.C. § 1602(f) (2000).

The TILA is to be broadly construed to provide protection for the consumer. As such, any failure to disclose information as required by the TILA or Regulation Z results in a technical violation. See *Walters v. First State Bank*, 134 F. Supp. 2d 778, 780 (W.D. Va. 2001).

Queen argues that Lynch Jewelers was required under the TILA to give him a written copy of the TILA disclosures before he entered into the credit transaction. This issue deals with the timing and the proper form for the TILA disclosures. The Kansas appellate courts have not addressed this issue and, as a result, consideration of cases from outside the jurisdiction is necessary.

To support his argument that Lynch Jewelers' actions violated the TILA, Queen relies on *Polk v. Crown Auto, Inc.*, 221 F.3d 691 (4th Cir. 2000). In *Polk*, a car dealership representative orally explained the credit terms to the buyer, but did not disclose the terms in writing in a form the buyer could take with him. After the parties consummated the credit transaction, the dealership representative gave the buyer copies of the retail installment sales contracts which contained the credit terms. The buyer alleged that the dealership violated the TILA and Regulation Z by not disclosing the credit terms before consummation of the transaction. The *Polk* court agreed, finding that the dealership was required to make the TILA disclosures to the buyer in writing and in a form that he could keep before consummation of the credit transaction. The grant of summary judgment to the dealership was reversed, and the case was remanded with directions to order judgment in favor of the buyer. 221 F.3d at 692.

Some district courts have interpreted *Polk* as requiring a creditor to give a copy of the TILA disclosures to the consumer in a form he or she can keep before consummation of the transaction. For example, *Walters*, 134 F. Supp. 2d 778, relied on *Polk* in holding that a bank violated Regulation Z when it gave a copy of the credit contract containing the TILA disclosures after the consumer signed the contract. The *Walters* court rationalized that "[s]urely, the requirement of Regulation Z, as interpreted in *Polk*, that the

consumer be given written disclosures, in a form that she can keep, means more than that the consumer simply must be shown the disclosures on the original credit contract prior to signing it." 134 F. Supp. 2d at 781.

*Walters* noted that its holding was consistent with the holding in *Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321 (W.D. Mich. 2000). In *Lozada,* the creditor argued that showing a consumer the written disclosures is sufficient to comply with the TILA disclosure requirement. The *Lozada* court responded to that argument as follows:

"Were the court to accept the position of [the creditor] that the regulation required only that consumers be shown the disclosures before becoming contractually obligated, the phrase 'in a form that the consumer may keep' would be rendered meaningless. In other words, if the regulation means no more than that the disclosures be made to consumers *in writing,* no additional meaning would be conveyed by requiring the form be one the consumer could keep." 197 F.R.D. at 337.

The *Lozada* court concluded that Regulation Z requires "delivery of a copy of the required disclosures to a consumer before consummation of the transaction" and cited *Polk* in support of that proposition. 197 F.R.D. at 337.

However, *Polk* does not require that a creditor separate the consumer's copy of the credit contract from the other copies of the contract and give the copy to the consumer before the consumer signs the contract. Such a requirement was rejected in *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535 (E.D. Va. 2001). The buyer in *Nigh* purchased a vehicle from a dealership, financing it with a retail sales contract. An employee of the dealership discussed the credit terms with the buyer, filled in a retail sales contract, and gave the buyer a copy of the contract after execution. The buyer brought suit against the dealership, alleging that the dealership violated the TILA by failing to provide a copy of the credit terms before he signed the sales contract so that he could shop for better credit terms.

The *Nigh* court rejected the argument that the creditor was required to provide the consumer with a separate copy of the TILA disclosures before consummation of the transaction. Instead, *Nigh*

held that giving the consumer the TILA disclosures on the contract before the consumer signed the contract complied with the TILA timing requirement. The court explained that the contract contained the required disclosures, the consumer had the opportunity to read the contract before signing it, and the consumer could have deferred signing if he chose to shop for a better interest rate. 143 F. Supp. 2d at 548-49.

The *Nigh* court noted that *Polk* does not state that the retail installment contract cannot be the document that the consumer may keep. 143 F. Supp. 2d at 548-49. In fact, the Federal Reserve Board's official staff commentary to Regulation Z provides that the disclosures may be made on the same document as the credit contract, provided they are segregated from the rest of the document. Official Staff Commentary on Regulation Z, 12 C.F.R. Pt. 226, Supp. I, § 226.17.

*Nigh* further noted that *Polk* is directed to the timing of the disclosures rather than the form of the disclosures. *Nigh* stated that "[t]he *Polk* court's principal holding was that a [*sic*] auto dealership (or other creditor) cannot give a buyer/debtor a copy of his credit terms after the consummation of a transaction; the dealer must provide a detailed disclosure of the credit terms in writing *before* consummation of the transaction." 143 F. Supp. 2d at 548. Nothing in *Polk* addressed the meaning of the language "in a form that the consumer may keep" in Regulation Z. *Nigh*, however, considered this issue and, as noted previously, found that a credit contract containing the TILA disclosures presented to the buyer before consummation of the credit transaction complies with the form requirements of the TILA. 143 F. Supp. 2d at 548-49.

We find the rationale applied in *Nigh* persuasive and hold that a creditor complies with the TILA disclosure requirements when the creditor presents a credit contract containing the TILA disclosures to a consumer before consummation of the credit transaction. Regulation Z requires a creditor to give the consumer the TILA disclosures in a form he or she can keep before consummation of the transaction. We find that there is no meaningful distinction between separation of a consumer's copy from the other copies of a credit contract containing the TILA disclosures before or after

signature. As a result, we reject Queen's contention that Lynch Jewelers was required to provide him with written copies of the disclosures separate from the copies of the contracts before he signed the contracts.

Queen has not shown, and cannot show, that Lynch Jewelers failed to comply with the TILA disclosure requirements. The uncontested evidence establishes that Lynch Jewelers provided him with contracts containing the TILA disclosures for his review before signing. The contracts, indisputably, were in writing and were in multiple copy form, with one copy for Queen. As such, the TILA disclosures were in a form capable of being kept or taken away. Queen was in physical possession of all copies of the contracts when he signed them. There is no evidence that Queen could not have kept or taken away his copies of the contracts containing the TILA disclosures before he signed. Queen chose to sign immediately and did not shop around for better credit terms. Lynch Jewelers should not be held liable for Queen's decision.

As a result, we find that the evidence submitted in this case supports the determination that Queen cannot prove that Lynch Jewelers failed to make the TILA disclosures in a form that he could keep before consummation of the transaction. The trial court did not err in granting a directed verdict in favor of Lynch Jewelers on the TILA claims.

*Conversion*

Next, Queen claims that the trial court erred in denying his motion for summary judgment on his conversion claim and entering summary judgment in favor of the defendants on that claim. The trial court found that the defendants were entitled to summary judgment because, as a matter of law, the act of retaining possession of the ring after Queen revoked acceptance could not constitute conversion. The trial court rationalized that the defendants could not have committed conversion because they had no obligation under the Uniform Commercial Code to return the ring to Queen after he revoked acceptance.

The standard of review for a motion for summary judgment is well established:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000).

"When the issue on appeal is whether the trial court correctly granted summary judgment, an appellate court should read the record in the light most favorable to the party against whom summary judgment was entered." *Bi-State Dev. Co., Inc. v. Shafer, Kline & Warren, Inc.*, 26 Kan. App. 2d 515, 517, 990 P.2d 159 (1999).

Conversion is defined as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986). A conversion may be based upon the detention of or unreasonable withholding of possession from one who has the right to possess it. 18 Am. Jur. 2d, Conversion § 47, pp. 176-77. One in possession of a chattel, as a bailee or otherwise, who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession is subject to liability for conversion. Restatement (Second) of Torts § 237 (1965). "To maintain an action for conversion, a plaintiff must have actual possession of the property or a right to immediately take possession of the property." *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 572, 796 P.2d 1060 (1990).

Queen alleges that the defendants converted the ring when they failed to return it after he demanded its return. However, the trial court found that the defendants did not commit conversion because they had no obligation under the Uniform Commercial Code to return the ring to Queen after he revoked acceptance. "Revocation of acceptance is a refusal to keep delivered goods that occurs after a buyer has accepted and the time for rejection has expired." *Johnson v. General Motors Corp.*, 233 Kan. 1044, 1046, 668 P.2d 139 (1983).

If Queen had possession of the ring after revocation of acceptance, then he would have been required to follow any reasonable

instructions by Lynch Jewelers with respect to the ring. See K.S.A. 84-2-604. If Lynch Jewelers did not provide reasonable instructions, then Queen could have stored the rejected ring, reshipped the ring to Lynch Jewelers, or resold the ring for Lynch Jewelers' account, all at Lynch Jewelers' expense. See K.S.A. 84-2-604. In addition, Queen could have cancelled under K.S.A. 84-2-711 or covered by purchasing a substitute ring and recovered damages under K.S.A. 84-2-712. If Queen had possession or control of the ring after he rightfully revoked acceptance, he would have had a security interest in the ring. See K.S.A. 84-2-711(3).

Queen, however, did not have possession of the ring when he revoked acceptance. Instead, the ring was in the possession of the defendants because Queen voluntarily left the ring with them. Queen argues that he had the right to possession of the ring under K.S.A. 84-2-711(3). However, a buyer's right to possession after revocation of acceptance is not absolute. Under K.S.A. 84-2-604, it seems that Queen elected to return the ring to the defendants. As such, to determine whether Queen has a claim for conversion, we must determine whether the defendants had rightful possession of the ring.

As noted previously, revocation of acceptance is a remedy available to an aggrieved buyer after acceptance of goods whereby the buyer may refuse to keep the goods. See *Johnson*, 233 Kan. 1044, Syl. ¶ 1. Although no case law could be found on the issue, a seller who has possession of goods at the time of revocation has no obligation under the Uniform Commercial Code to return the goods to the buyer. Such a requirement would be inconsistent with revocation of acceptance as a remedy for an aggrieved buyer to refuse to keep goods. As a result, we find that a seller in possession of goods when a buyer revokes acceptance has no obligation to return the goods to the buyer.

This finding is consistent with K.S.A. 84-2-604, which provides that a buyer's exercise of any of the options under the statute "is not acceptance or conversion." The Kansas Comment to the section states that K.S.A. 84-2-604 prevents a buyer's actions "from being treated as acceptance or conversion of the goods." K.S.A. 84-2-604, Kansas Comment, 1996. If a buyer cannot be held liable

for conversion when he or she retains possession of goods after revocation of acceptance, it follows that a seller cannot be held liable for conversion if it is in possession of the goods when the buyer revokes acceptance.

Here, the defendants were in possession of the ring when Queen revoked acceptance and had no obligation under the Uniform Commercial Code to return the ring to Queen. Because the defendants were in rightful possession of the ring after Queen elected to return it to them, as a matter of law, they could not have committed conversion. As a result, we find that the trial court did not err in granting summary judgment in favor of the defendants on Queen's claim of conversion.

*The Kansas Consumer Protection Act*

Finally, Queen contends that his claims under the KCPA, K.S.A. 50-623 *et seq.*, should have survived summary judgment. "Whether a deceptive act or practice has occurred under the Kansas Consumer Protection Act is not a question of law for the court, but rather a question of fact for the jury to decide." *Manley v. Wichita Business College,* 237 Kan. 427, Syl. ¶ 2, 701 P.2d 893 (1985). Although the issue of whether a supplier has engaged in a deceptive act in violation of the KCPA typically is a jury question, summary judgment is appropriate if there is no evidence of deceptive conduct. See *Stair v. Gaylore,* 232 Kan. 765, 775-76, 659 P.2d 178 (1983) (affirming directed verdict for defendant on some KCPA claims because no evidence of deceptive or unconscionable acts was presented and reversing on other KCPA claims).

The KCPA prohibits, *inter alia*, a supplier from engaging in "any deceptive act or practice in connection with a consumer transaction." K.S.A. 50-626(a). The Act also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." K.S.A. 50-627(a). Under the KCPA, a "supplier" is a person who, in the ordinary course of business "solicits, engages in or enforces consumer transactions . . . ." K.S.A. 50-624(i). A "consumer transaction" is "a sale, lease, assignment or other disposition for value of property or services within this state . . . to a consumer . . . ." K.S.A. 50-624(c). A "con-

sumer" is one who "seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. 50-624(b). The defendants acknowledge that they are suppliers under the KCPA and that the sale of the ring was a consumer transaction under the statute.

In his petition, Queen alleged that the defendants violated the KCPA when they

"made the following various misrepresentations knowingly, or with reason to know, that they were false and were thus in violation of K.S.A. 50-626 and 50-627:

"a. the setting was represented by James Lynch to be a '14 carat' white gold ring;

"b. the stone had suffered 'chip' damage when in Plaintiff's possession, which the seller repaired 'without loss of carat weight', and the setting suffered abrasion damage;

"c. the seller had lawful right to possession of the stone and ring, in spite of the demand for its return by Plaintiff on March 26, 2000."

Queen further alleged that "the totality of the Defendant seller's conduct in this transaction constitutes unconscionable conduct under K.S.A. 50-627 . . . ."

At the hearing on the motions for summary judgment, Queen reiterated that his KCPA claims were based on the acts alleged in his petition. Queen did not allege any additional conduct by the defendants to support his KCPA claims. Queen also stated at the motions hearing that the defendants' conduct violated subsections (a) and (b)(8) of K.S.A. 50-626. As noted previously, K.S.A. 50-626(a) generally prohibits any deceptive practice in a consumer transaction. Subsection (b)(8) of the statute prohibits "falsely stating, knowingly or with reason to know, that a consumer transaction involves consumer rights, remedies or obligations." K.S.A. 50-626(b)(8). The trial court granted summary judgment to the defendants on Queen's KCPA claims because there was no evidence to support those claims.

On appeal, Queen alleges multiple violations of the KCPA. First, Queen claims that the defendants' violations of the TILA constitute a violation of the KCPA. This argument, however, was not presented to the trial court and, as a result, will not be considered for

the first time on appeal. See *Wood v. Groh*, 269 Kan. 420, 434, 7 P.3d 1163 (2000) ("A new legal theory may not be asserted for the first time on appeal . . . .").

In addition, Queen claims that the defendants violated the KCPA by vandalizing the ring and accusing him of causing the damage. First, Queen's allegation that the defendants vandalized the ring cannot be considered on appeal because it was not presented to the trial court. Furthermore, Queen's allegation that the defendants accused him of vandalizing the ring does not involve any false statement regarding consumer rights, remedies, or obligations, nor does the statement constitute a deceptive practice. See K.S.A. 50-626(a); K.S.A. 50-626(b)(8). As such, the trial court was correct in granting summary judgment to the defendants on this alleged violation of the KCPA.

Queen also claims that the defendants' statement that they had the lawful right to possession of the ring is a violation of the KCPA. This claim must fail because, as found previously, the defendants had lawful possession of the ring after Queen revoked acceptance. Because the defendants had lawful possession of the ring, their statement to that effect did not constitute a violation of the KCPA.

Finally, Queen alleges that the defendants violated the KCPA when they represented that the solitaire was a "one carat diamond" after the chip was repaired. Again, Queen revoked acceptance of the ring before the solitaire was repaired and before the defendants represented that it was a 1 carat diamond. Accordingly, the defendants' statement that the solitaire was a 1 carat diamond after repair is not a statement regarding a consumer right, remedy, or obligation. See K.S.A. 50-626(b). Moreover, Queen has presented no evidence that the repair process caused the solitaire to weigh less than 1 carat.

As a result, we find that the trial court did not err in granting summary judgment in favor of the defendants on Queen's claims that they violated the KCPA.

Affirmed.