(138 P.3d 365)
No. 94,846

JOHN CRANDALL and CONSTANCE CRANDALL, *Appellants*, v.
MIKE GRBIC, *Appellee*.

Opinion filed July 14, 2006.

*Todd E. Shadid* and *Chasity M. Helm*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, for appellants.

*Teresa L. Sittenauer*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee.

Before RULON, C.J., ELLIOTT, J., and KNUDSON, S.J.

RULON, C.J.: Plaintiffs John and Constance Crandall appeal from a district court order granting summary judgment to defendant Mike Grbic. Plaintiffs sued defendant under theories of breach of fiduciary duty, fraud, misrepresentation, and violation of the Kansas Consumer Protection Act. We affirm.

## Underlying Facts

In June 2003, the plaintiffs, who were California residents, went to Wichita, Kansas, and looked at houses for sale as they were anticipating relocating to Wichita to be closer to family. At the time, plaintiff Constance Crandall held a license to sell real estate in California.

Plaintiffs entered into a Buyer Agreement Exclusive Buyer Agent contract (Buyer's Agreement) with defendant, a licensed realtor. The Buyer's Agreement included clauses providing that defendant would promote the interest of the plaintiffs; that defendant would disclose all adverse facts that he knew; and that defendant would advise the plaintiffs to get expert advice on matters beyond defendant's expertise.

For easier reference, the specific wording of the Buyer's Agreement document and all other documents referenced in this facts section will be discussed in detail where necessary in our discussion of the presented issues.

Plaintiffs first looked at the house at 1528 Creekside Court (the House) in June 2003, as part of a showing of more than 20 houses by defendant. At that time plaintiffs did not perform a detailed inspection of the condition of the houses they viewed; rather plaintiffs were just looking at general layout and features. Prior to July 18, plaintiffs viewed the House a second time with their children and plaintiff John Crandall's parents. Plaintiff John Crandall said the House looked "fairly good" cosmetically at that time and he did not see stains on the carpet.

The asking price on the House was $249,500, but plaintiffs offered $235,000 and their offer was accepted. On July 9, 2003, plaintiffs received a copy of the Seller's Property Disclosure Statement (Disclosure Statement). In the Disclosure Statement, the sellers, Tim and Rebecca King, indicated that, to their knowledge, there were no present or past roof leaks; the roof had not been repaired by them; and no insurance claim had been submitted based on the roof in the past 5 years. Further, the Kings indicated although they had owned a pet, there was no damage to the House from the pet "including but not limited to odors, stains, etc." The Kings did note, however, that "South basement window well has leaked with heavy rain from South."

In signing the Disclosure Statement, plaintiffs acknowledged they had been advised of the need for independent investigation as to the representations made by the Kings; that plaintiffs had carefully inspected the property personally; and that plaintiffs were not relying on any representations made by the seller or realtor.

On July 18, 2003, plaintiffs entered into a Contract for Purchase and Sale of Real Estate (Purchase Contract) to buy the House. The Purchase Contract provided that no warranties or representations had been made by the sellers or the realtor except as explicitly listed and further provided plaintiffs were relying on plaintiffs' own judgment and on the judgment of any inspectors plaintiffs might select. The Purchase Contract specifically contained a clause requiring mediation of any disputes.

Because plaintiffs were still living in California, plaintiff Constance Crandall asked defendant for a recommendation for someone to do a home inspection. Defendant recommended Tom Beard Home Inspections (Beard). Plaintiff Constance Crandall asserts she asked defendant to be plaintiffs' " 'eyes and ears' " because plaintiffs were unable to be at the inspection. Plaintiff Constance Crandall requested that defendant attend the inspection and inspect the house for defects. Defendant claims he did not remember specifically being asked to be plaintiffs' " 'eyes and ears.' " Defendant said plaintiffs did tell him plaintiffs were relying on defendant to help with the overall transaction, but not specifically in regard to the inspection. Defendant asserts that he did not represent to the plaintiffs in any way that defendant would actively search for defects in the House during the inspection. Defendant maintains that "[i]t was the home inspector's job to inspect the house."

The inspection was attended by defendant and plaintiff John Crandall's father. The inspector reported the roof was nearing the end of its life expectancy, and there was damage on one side. Further, the inspector reported the low slope of the roof on the covered patio and recommended low slope roofing material be added and further evaluation needed to be done on that part of the roof.

Defendant faxed a copy of the home inspector's report to plaintiff Constance Crandall and spoke with her by phone about the report. In response to the home inspector's concerns, defendant arranged for an inspection of the roof by Herzberg & Sons Roofing. Brice Herzberg performed the roof inspection. Herzberg said that he talked to someone, possibly defendant, about the roof and told the person "there could be an issue down the road" with the patio

roof because the roof's pitch was insufficient for the shake shingles. Herzberg testified that without looking underneath the shingles or actually seeing a leak there was no way to tell if the roof actually was leaking. According to Herzberg, "there's times I have got up on roofs and seen issues that I could swear were leaking and they are not. Then other times they are having huge leaks and it doesn't look like anything is wrong so . . . you just never know."

Herzberg further said he was not concerned with the patio roof because it covered a screened-in porch area rather than an indoor part of the House and any problem with the patio roof could have been repaired by taking up the shingles and replacing them with a composition roll-type roof which he estimated would cost $514.

When Herzberg reported his findings to defendant, defendant told Herzberg not to include the cost of the patio roof in the overall roof estimate because Herzberg was not sure there was actually a leak. Herzberg then wrote an estimate for $1800 to replace shingles and otherwise fix the main roof.

Defendant sent a copy of Herzberg's estimate to plaintiffs. Defendant asserts he made plaintiff Constance Crandall aware of the potential for problems with the patio roof in a telephone conversation, which plaintiff Constance Crandall denies. Plaintiffs asked the Kings to pay for half of the $1800 estimate for the necessary repairs, but the Kings refused. Plaintiffs then indicated to defendant they did not want to buy the House and intended to cancel the contract. Defendant said he persuaded plaintiffs the House was well priced and a good deal, and plaintiffs changed their minds and decided to proceed with the purchase.

Plaintiffs insisted the final walk-through of the House occur before closing with the sellers present. Defendant testified it was unusual for the sellers to be present for the final walk-through, so the Kings were not available to participate in the walk-through until the day of closing.

On the day of closing, plaintiffs and the Kings toured the House after the parties had signed the closing documents and arrangements had been made for a wire transfer of the purchase price from the plaintiffs' account in California. Defendant testified the walk-through occurred before the closing was complete because

such happened before any money changed hands. Plaintiff Constance Crandall testified she felt plaintiffs could have possibly cancelled the Purchase Contract at that time if plaintiffs so wanted.

During the walk-through, plaintiff John Crandall noticed stains on the decking of the patio which appeared like mildew and asked Tim King if the patio roof had leaked in the past and King said no. Plaintiffs and Kings discussed a basement window which had formerly leaked. Plaintiff Constance Crandall said she was a little concerned the leak had not been mentioned on the Disclosure Statement, but she "took Mr. King at his word" the leak had been fixed. In fact, this leak was mentioned on the Disclosure Statement. Plaintiff Constance Crandall noticed a carpet stain in the basement, and Rebecca King promised to pay to replace the carpet.

The day plaintiffs moved into the House, as the sun was going down, plaintiff Constance Crandall noticed yellow stains in other places on the carpet. The carpet was new in 2002 and had been treated with an enzyme to repel pet stains. Nevertheless, when plaintiffs turned off the air conditioner and were able to smell the stains, plaintiffs determined such were pet urine. Plaintiff Constance Crandall testified that "[i]t was difficult to distinguish until you got down on your hands and knees and smelled the stain." "The shading and shadows in the house [made the stains difficult to see] plus there was the whole house air purifier system which was masking the odor and the enzyme in the carpet which was masking the odor."

After plaintiffs moved in, they noticed the patio roof leaked "like a sieve" and had for some time, and noticed pet scratch damage to the windowsills and doors, a leak in the basement window, and mold growth in the basement. By coincidence, plaintiffs called Brice Herzberg to make an estimate on how much the patio roof would cost to fix. Despite Herzberg's earlier estimate, he quoted $845 to fix the patio roof. Herzberg testified the increase in price from his original $514 estimate was because he did not want the business as much by the time he made the second estimate. In the course of Herzberg's examination of the patio roof to prepare the second estimate, plaintiff Constance Crandall found out about the information that was left out of the first roof estimate.

Plaintiffs have pursued multiple remedies against all parties involved in this transaction and were refunded the cost of the home inspection. Plaintiffs attempted unsuccessfully to mediate with the Kings.

Plaintiffs then filed suit against defendant, alleging breach of fiduciary duty; violation of the Kansas Consumer Protection Act (KCPA); and misrepresentation and omission. Eventually, defendant filed a motion for summary judgment asserting he did not owe plaintiffs any duty outside the Purchase Contract and he had not violated the KCPA. Defendant further claimed plaintiffs' failure to attempt mediation before filing suit precluded their claims. Plaintiffs then attempted to mediate their dispute with defendant, as provided for in the Purchase Contract, but defendant refused to attend the mediation.

The district court granted defendant summary judgment on all claims.

## Summary Judgment

Because the district court granted summary judgment in favor of defendant, the issue before this court is whether summary judgment was proper.

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issues to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. . . . On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]

" 'An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000).

## Defendant's Fiduciary Duty to Plaintiffs

The district court found defendant's fiduciary duty was defined by the Buyer's Agreement, other documents made in the course

of the sale, and K.S.A. 2004 Supp. 58-30,107 of the Brokerage Relationships in Real Estate Transactions Act (BRRETA). The court found defendant performed all of his duties. Further, the court ruled the plaintiffs were precluded by K.S.A. 2004 Supp. 58-30,107 from pursuing claims based upon material matters about which the buyer's agent had urged the plaintiffs to seek an expert opinion. Lastly, the court found plaintiffs failed to prove causation.

## Genuine Issues of Material Fact

Plaintiffs first argue whether defendant had a duty to participate in the home inspection raises genuine issues of material fact as to: (1) what extent defendant agreed to participate; (2) what extent defendant failed to participate; and (3) what impact defendant's failure to participate had on plaintiffs' decision to buy the House. These issues are undisputed because defendant admits he did not participate in the home inspection because "[i]t was the home inspector's job to inspect the house."

Next, plaintiffs assert that genuine issues of material fact exist as to why defendant told Herzberg to exclude the information about the patio roof and whether defendant told the plaintiffs about the potential problems with the patio roof. Plaintiffs fail to explain why the reason for defendant's exclusion of the patio roof from the roof estimate is a genuine issue of material fact. Defendant said he told Herzberg to exclude the cost to repair the patio roof because Herzberg was not sure there was a problem. Plaintiffs never assert that defendant had any other reason for excluding the information; therefore, this fact is undisputed.

The parties do dispute whether defendant spoke with plaintiff Constance Crandall about the patio roof, but the district court resolved that dispute in favor of the plaintiffs. The court found that Herzberg performed the inspection, defendant instructed Herzberg to leave out the information about the patio roof, and defendant faxed the estimate to fix the roof to the plaintiffs.

Plaintiffs then claim the timing and length of the final walk-through create a genuine issue of material fact. Again, the plaintiffs fail to show how these issues are disputed. Both parties agree the walk-through happened after the closing documents were signed,

but before money had changed hands. In plaintiffs' brief, they specifically say both parties said the walk-through lasted for approximately an hour and a half. There is nothing in dispute here.

## Duty and Breach

As there are no genuine issues of material fact between the parties, this court must next consider whether the district court properly found defendant was entitled to judgment as a matter of law. In finding defendant was entitled to judgment as a matter of law, the court interpreted both the documents surrounding this transaction and K.S.A. 58-30,107 to determine defendant's duties to plaintiffs.

The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review independent of the district court's construction. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). This same de novo standard applies to questions of statutory interpretation. *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 451, 124 P.3d 57 (2005).

The relevant portions of the Buyer's Agreement state:

"5. Broker agrees to perform the terms of this Agreement, promote the interest of the Buyer with utmost good faith, loyalty and fidelity, and subject to the following, present all offers, counteroffers and back-up offers in a timely manner.

. . . .

"8. Broker will disclose to the Buyer all adverse material facts actually known by the Broker and advise the Buyer to obtain expert advice as to material matters known by the Broker but the specifics of which are beyond the Broker's expertise. Broker shall . . . comply with all requirements of the Brokerage Relationships in Real Estate Transactions Act of Kansas and comply with any applicable federal, state and local laws, rules and regulations and ordinances, including fair housing and civil rights statutes, rules and regulations."

The relevant portions of the Disclosure Statement state:

"1. I [the Crandalls] personally have carefully inspected the property. I will rely upon the inspections encouraged under my contract with Seller. Subject to any inspections, I agree to purchase the property in its present condition without representations or guarantees of any kind by the Seller or any REALTOR concerning the condition or value of the property.

"2. I agree to verify any of the above information that is important to me by an independent investigation of my own. I have been advised to have the property examined by professional inspectors.

"3. I acknowledge that neither Seller nor any REALTOR involved in this transaction is an expert at detecting or repairing physical defects to the property. I state that no important representations concerning the condition of the property are being relied upon by me except as disclosed above or as fully set forth as follows: [left blank]."

The relevant portions of the Purchase Contract state:

"18. **REPRESENTATIONS AND RECOMMENDATIONS**: It is hereby agreed and acknowledged by the parties hereto that unless otherwise stated in paragraph 30 (Miscellaneous), neither the listing nor selling brokers, or their agents, employees, or associates have made, on their own behalf, any representations or warranties, expressed or implied, with respect to the Property. Any information furnished to either party through the Multiple Listing Service or in any property condition report should be independently verified by that party before that party relies on such information. Any representations made herein have been made by the listing/selling brokers based on information supplied by sources believed to be reliable, and brokers and their associates have not assumed any responsibility, directly or indirectly, with respect to any representation or warranties which have been made. Since the selling/listing brokers are acting as brokers only, they shall, under no circumstances, be held liable to either Seller or Buyer for performance or lack of performance of any terms or conditions of this Contract. Again, it is emphasized that if any party believes representations have been made, they must be set forth specifically and in writing in paragraph 30 (Miscellaneous) if they are to be effective or enforceable. [Paragraph 30 lists three items, all unrelated to this suit.]

. . . .

"20. **INSPECTION**: The Buyer has carefully examined the Property and the Improvements, and in making the decision to buy the Property, the Buyer is relying wholly and completely upon Buyer's own judgment and the judgment of any contractors or inspectors Buyer may have selected. . . . Buyer agrees that the purchase price was negotiated after consideration of all defects in the Property of which Buyer was aware or reasonably should have been aware. Buyer hereby agrees that brokers are not responsible if Seller has failed to disclose any known defect or material fact regarding the Property. . . . These inspections are not intended to identify either cosmetic imperfections or other features of the Property which Buyer has already considered in determining the purchase price. . . . The parties agree and the Buyer represents that once the Contract has in fact been closed, that Buyer in all respects again has acknowledged that Buyer has accepted the premises without condition or qualification. Broker(s) shall not be respon-

sible for the conduct of third parties providing specialized services required or permitted by this Contract, including but not limited to lender, title insurance company, escrow agent, closing agent, wood infestation, mechanical, structural or other inspectors or repair personnel, whether those services were arranged by Buyer or Seller or broker on behalf of either."

### K.S.A. 58-30,107 states:

"(a) A buyer's or a tenant's agent shall be a statutory agent with the duty and obligation to:

(1) Perform the terms of the written agreement made with the client;

(2) promote the interests of the client with the utmost good faith, loyalty and fidelity, including:

(A) Presenting in a timely manner all offers to and from the client when such offer is received prior to the closing of the sale unless the buyer instructs the broker in the agency agreement not to submit offers after the client enters into a purchase contract;

(B) disclosing to the client all adverse material facts actually known by the licensee; and

(C) advising the client to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee . . . ."

### K.S.A. 58-30,107(b) further states:

"If pursuant to subsection (a)(2)(C), the licensee advised the client to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee, no cause of action for any person shall arise against the licensee pertaining to such material matters."

The district court found the above documents and statute defined the limits of defendant's duty to plaintiffs. Plaintiffs, however, assert such findings were merely defendant's minimum duties, and defendant had other duties as well. In support of plaintiffs' proposition they cite to K.S.A. 58-30,107(d)(5) which requires that, if a broker performs an inspection, the broker must perform the inspection with reasonable care. This statute is inapplicable here because both parties agree that defendant did not perform an inspection—that is the very thing about which the plaintiffs are complaining. Next, plaintiffs assert defendant's violation of the Code of Ethics and Standards of Practice for the National Association of Realtors supports their assertion. However, plaintiffs fail to allege exactly what provision of the code or standard of practice

defendant has violated. Even if there was a violation, nowhere do plaintiffs establish that a violation of this code can be the basis for a private cause of action. In short, plaintiffs fail to define or show what other duties bound defendant.

In absence of additional duties, the district court's interpretation of defendant's duties, as defined by the documents and statute are correct. Defendant had a duty to represent plaintiffs faithfully and to recommend professional inspections. Defendant had a duty to plaintiffs if he became aware of a defect in the House of which they would not have been aware, but defendant did not have the duty to perform a home inspection for plaintiffs. Defendant specifically said, in documents plaintiffs signed, that plaintiffs were to rely on plaintiffs' inspectors and not defendant.

Given defendant's duty, clearly defendant properly executed his duty. Defendant advised plaintiffs to get professional inspections, and they did so. Under K.S.A. 58-30,107(b), this absolves defendant of any liability as to the matters covered in the inspection, namely the patio roof. Plaintiffs have failed to prove that defendant breached any duty to them, and the district court was correct in granting summary judgment on this issue.

## Causation

In addition to finding there was no breach of duty, the district court found plaintiffs failed to show that, if defendant had breached his duty to them, that breach was the cause of plaintiffs' damages. Plaintiffs allege $27,334.31 in damages. At maximum estimate the patio roof was approximately a $900 fix. Plaintiffs fail to account for how defendant caused the other approximately $26,400 in damages; therefore, their case fails on the element of causation as well.

## Fraud by Silence

The district court found defendant did not make any untrue statements or withhold any information from plaintiffs. The court found plaintiffs could not show they had reasonably relied on anything defendant did or did not say, because plaintiffs received and reviewed the home inspection report, which contained information about the condition of the patio roof.

"[F]raud is never presumed and must be established by clear and convincing evidence. . . . The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment. [Citation omitted.]" *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004).

"To prove fraudulent concealment, a plaintiff must establish that the party concealing facts was under a legal or equitable duty to communicate those facts to the plaintiff." 277 Kan. at 410.

The plaintiffs allege their fraud claim arises from acts and omissions made by defendant after the Purchase Contract was signed; therefore the Purchase Contract does not relieve defendant of liability. This argument is refuted by the language of the Purchase Contract. The Purchase Contract provides, among others, paragraphs 18, 19, and 20 will remain in effect after closing. Paragraph 18 provides the brokers have not made "any representations or warranties, expressed or implied, with respect to the Property. . . . [B]rokers . . . have not assumed any responsibility, directly or indirectly, with respect to any representation or warranties which have been made." Paragraph 19 provides the brokers have made no representations concerning the environmental condition of the property. Paragraph 20 provides:

"Buyer represents that once the Contract has in fact been closed, that Buyer in all respects again has acknowledged that Buyer has accepted premises without condition or qualification. Broker(s) shall not be responsible for the conduct of third parties providing specialized services required or permitted by this Contract, including but not limited to . . . inspectors or repair personnel, whether those services were arranged by Buyer or Seller or broker on behalf of either."

Based on the language of the Purchase Contract, plaintiffs' assertion the above provisions only apply to acts and omissions that occurred before the Purchase Contract was signed fails.

### Untrue Statement of Fact/Fraudulent Concealment

Plaintiffs next allege defendant knowingly concealed a material fact—*i.e.*, the condition of the patio roof. Based on the contracts surrounding this transaction, clearly defendant had a duty to communicate any material facts to the plaintiffs. However, this argu-

ment still fails, because, as the district court correctly found, defendant did not withhold any facts from the plaintiffs they did not already know.

In regard to the roof, the home inspector's report said:

"Roofing system is approaching end of 'Normal Life Expectancy.' Damage to shingle on east side, missing shingles just above covered patio. Several shingles show signs of cupping and curling.

"Roof system on covered patio needs further evaluation. The patio roof is a low slope roof & requires a low slope roofing system."

"Damage noted on east side, missing shingles above covered patio. Roof has normal life expectancy of 15-20. Patio roof is 'low slope.' Recommend low slope roofing material be added. Signs of cupping & curling pg. 19."

"Recommend repairs of damages & missing areas, recommend roof system be checked for insurability before closing."

The home inspection report, which plaintiffs received, shows plaintiffs were informed of the need for low slope roofing material on the patio. The information was not withheld from plaintiffs. Clearly, there was no untrue statement of fact or fraudulent concealment.

## Justifiable Reliance

Plaintiffs allege they justifiably relied on defendant's alleged fraudulent concealment of the condition of the patio roof. Defendant argues that plaintiffs could not have justifiably relied on any representations defendant made because of the disclaimer in the Purchase Contract.

Defendant relies upon *Alires v. McGehee*. In *Alires*, home buyers sued their sellers for fraud surrounding a water leak in the house. The evidence showed the sellers knew about a leak and falsely represented to the buyers that the leak had been fixed. The sellers sought to avoid liability under their contract with the buyers, and, in determining the applicability of waiver provisions similar to those in the Purchase Contract in this case, the *Alires* court said:

"[T]he buyer of real estate could not reasonably rely upon representations of the seller when the truth or falsity of the representation would have been revealed by an inspection of the subject property and the misrepresentations were made prior to or as part of the contract in which the buyer contracted for the right to inspect, agreed that the statements of the seller were not warranties and should

not replace the right of inspection, declined inspection, and waived any claims arising from defects which would have been revealed by an inspection." 277 Kan. at 411-12.

Defendant further relies upon *Hamtil v. J.C. Nichols Real Estate*, 22 Kan. App. 2d 809, 923 P.2d 513 (1996). In *Hamtil*, the buyers of a house sued their realtors after discovering water damage. They alleged that their realtors had made false statements about the condition of the house. Again, language in the contract between the realtor and the buyers was substantially similar to disclaimers made in the Purchase Contract in this case. The *Hamtil* court concluded the language of the contract was not contrary to public policy and should be enforced. 22 Kan. App. 2d at 814.

Plaintiffs rely on *White v. J.D. Reece Co.*, 29 Kan. App. 2d 226, 26 P.3d 701 (2001). In *White*, the buyer of a house sued her real estate agent when structural damage to the house was found. However, as defendant notes, the facts of *White* are distinguishable. In *White*, the real estate agent told the buyer not to attend the inspection. After the inspection, the real estate agent himself made a list of necessary repairs. The list omitted major problems including cracking, movement, and leakage of a foundation wall. After the repairs listed were made, the buyer asked if the house should be reinspected, but the real estate agent said it was not necessary. The *White* court concluded: "[W]hen a real estate broker's agent purposely injects himself or herself into the independent investigation of the property to the buyer's detriment, the real estate broker and its agent cannot rely on the seller's disclosure statement to shield themselves from liability." 29 Kan. App. 2d at 234.

Here, defendant's conduct was not nearly so egregious. Defendant did not keep plaintiffs from attending the inspection; in fact, plaintiff John Crandall's father attended the inspection. The house inspector independently wrote his report, which included the potential for problems with the patio roof. Further, at no time did defendant attempt to dissuade plaintiffs from asking questions or seeking further inspections. This case is more similar to *Alires* and *Hamtil* than *White*. As such, the district court was correct to find plaintiffs could not have reasonably relied on any representations

made by defendant in light of the disclaimers in the Purchase Contract. The district court was correct in granting summary judgment.

## Negligent Misrepresentation

The district court found that, because defendant disclaimed knowledge of the House's condition, advised plaintiffs to obtain professional inspections, and communicated the results of those inspections to the plaintiffs, defendant had exercised reasonable care as to the representations defendant made to the plaintiffs.

The tort of negligent misrepresentation was first recognized in *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 876 P.2d 609 (1994). A person commits negligent misrepresentation where, in the course of business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, he or she supplies false information for the guidance of others in their business transactions because he or she failed to exercise reasonable care or competence in obtaining or communicating the information. 255 Kan. at 604. However,

"real estate brokers may protect themselves from negligent misrepresentation actions by disclaiming knowledge of the property's defects and having a buyer or seller acknowledge such disclaimer. Such protection is not against public policy and, in fact, helps to clarify the law and the role of those involved in real estate matters." *Hamtil*, 22 Kan. App. 2d at 814.

As the facts of both *Hamtil* and *Alires* were discussed in our discussion of plaintiffs' fraud claim, we need not revisit those cases. However, both *Hamtil* and *Alires* support the proposition that where a seller or real estate agent disclaims any representations or warranties concerning the condition of a house, and a buyer acknowledges that disclaimer and states that he or she is not relying on the seller or realtor, then the realtor or seller is immune from suit as to the condition of the house. *Alires*, 277 Kan. at 411-12; *Hamtil*, 22 Kan. App. 2d at 814.

Here, the Purchase Contract stated and plaintiffs acknowledged the plaintiffs were not relying on any representations of their realtor with regard to the condition of the house. The Purchase Contract states:

"18. It is hereby agreed and acknowledged by the parties hereto that unless otherwise stated in paragraph 30 (Miscellaneous), neither the listing nor selling brokers . . . have made . . . any representations or warranties, expressed or implied, with respect to the Property. . . . [B]rokers and their associates have not assumed any responsibility . . . with respect to any representation or warranties which have been made.

. . . .

"20. [T]he Buyer is relying wholly and completely upon Buyer's own judgment and the judgment of any contractors or inspectors Buyer may have selected . . . . Buyer hereby agrees that brokers are not responsible if Seller has failed to disclose any known defect or material fact regarding the Property."

As discussed above these provisions remained in effect after closing. Under *Hamtil* and *Alires*, defendant disclaimed liability for any representations made; therefore he cannot be found liable for negligent misrepresentation. The district court was correct to grant summary judgment on this issue.

## The Kansas Consumer Protection Act

Next, plaintiffs allege defendant violated several provisions of K.S.A. 50-626, as well as one provision of K.S.A. 50-627. The district court found defendant did not deceive the plaintiffs as to any aspect of the House and therefore had not committed deceptive practices as required to be in violation of K.S.A. 50-626. The court further found defendant did not commit an unconscionable act or practice as defined by K.S.A. 50-627.

The Kansas Consumer Protection Act should be "construed . . . to . . . protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623. However,

"[t]ransactions that merely appear unfair, or in retrospect are bad bargains, do not state a claim under the KCPA. [Citation omitted.]. . . . Where a record is 'devoid of any evidence of deceptive or oppressive practices overreaching, intentional misstatements, or concealment of facts,' there is no claim under the KCPA. [Citation omitted.]" *Gonzales v. Associates Financial Serv. Co. of Kansas*, 266 Kan. 141, 166-67, 967 P.2d 312 (1998).

The relevant provisions of K.S.A. 50-626 state:

"(a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

"(b) Deceptive acts and practices include, but are not limited to, the following . . .

(1) Representations made knowingly or with reason to know that:

(A) Property or services have . . . characteristics . . . that they do not have . . .

. . . .

(D) property or services are of particular . . . quality . . . if they are of another which differs materially from the representation;

. . . .

(G) . . . characteristic of property or services has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof or substantiation represented to exist;

(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

Whether a deceptive practice has been committed is ordinarily a question of fact for the jury; however, summary judgment is appropriate if there is no evidence of deceptive conduct. *Queen v. Lynch Jewelers, LLC*, 30 Kan. App. 2d 1026, 1038, 55 P.3d 914, *rev. denied* 275 Kan. 965 (2002). As defendant argues, the fact the potential for problems with the patio roof was mentioned in numerous places on the house inspector's report effectively precludes any claim under this section. Defendant did not deceive plaintiffs in any of the ways listed in the statute.

In addition, defendant is correct in asserting that while intent is not required for a violation of K.S.A. 50-626(b)(1), intent is required for a violation of K.S.A. 50-626(b)(2) and (b)(3). See *Moore v. Bird Engineering Co.*, 273 Kan. 2, 15-17, 41 P.3d 755 (2002) (discussion of legislative history and differing intent requirements of these three provisions). Plaintiffs do not assert defendant intended to deceive them; therefore, the district court was correct in granting summary judgment on plaintiffs' claims under K.S.A. 50-626.

The relevant provision of K.S.A. 50-627 states:

"(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. . . .

"(b) The unconscionability of an act or practice is a question for the court. In determining whether an act or practice is unconscionable, the court shall consider

circumstances of which the supplier knew or had reason to know, such as, but not limited to . . . that:

(1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language or an agreement or similar factor."

There is little guidance concerning what types of conduct would constitute unconscionable acts or practices under K.S.A. 50-627(b)(1). However, the 1973 legislative comments to the statute provide a few illustrations of unconscionable acts, including the use of legal verbiage in a transaction with a low-income consumer so that the consumer cannot readily comprehend the terms. See *State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, 1318, 38 P.3d 707 (2002).

Plaintiffs assert they were taken advantage of because of their location, *i.e.*, they were out of state for most of the sale. Being out of state does not equate to physical infirmity or illiteracy within the meaning of K.S.A. 50-627(b)(1). Plaintiff Constance Crandall has a real estate license. Throughout this transaction she communicated back and forth with defendant via telephone and fax. Plaintiffs were free to attend the home inspection themselves but chose not to. In all aspects of this transaction, plaintiffs acted as sophisticated consumers, and as such, their argument they were taken advantage of is not supported by this record. Consequently, the district court was correct to grant summary judgment.

## Failure to Mediate

Finally, the district court found the mediation clause in the Purchase Contract required plaintiffs to attempt mediation before filing suit. Because plaintiffs did not attempt mediation until after filing suit, the district court found such was further reason to grant defendant's summary judgment claim. We agree.

The mediation clause in the Purchase Contract states:

"29. **MEDIATION**. Any dispute or claim arising out of or relating to this Contract, the breach of this Contract or the services provided in relation to this Contract, shall be submitted to mediation in accordance with the rules and procedures of the Homesellers/Homebuyers Dispute Resolution System. Disputes shall include representations made by the Buyer, Seller, or any real

> estate broker/licensee in connection with the sale, purchase, financing, condition, or other aspect of the Property including, without limitation, allegations of concealment, misrepresentation, negligence, and/or fraud. . . . The following matters are excluded from mediation hereunder . . . (e) violation of Kansas real estate license laws."

Plaintiffs assert that because their suit claims defendant violated his duties under K.S.A. 58-30,107, a violation of Kansas real estate license laws is therefore excluded from mediation. K.S.A. 58-3050(a)(1) provides that a real estate license may be revoked or suspended if a licensee commits a violation of BRRETA. K.S.A. 58-30,107 is part of BRRETA.

The Kansas Real Estate Brokers' and Salespersons' License Act, K.S.A. 58-3034 *et seq.*, deals with the process of getting and keeping a real estate license. K.S.A. 58-3050, the provision plaintiffs cite, deals with the procedure for revocation of a real estate license. Nowhere in the pleadings, documents, or brief do the plaintiffs allege there was anything defective about defendant's license to sell real estate. Nowhere do plaintiffs directly allege a violation of K.S.A. 58-3050. Plaintiffs' BRRETA claim is more similar to a fraud or misrepresentation claim, both of which are specifically required to be mediated under the mediation clause.

Plaintiffs argue because plaintiffs attempted to mediate, after defendant had filed a motion for summary judgment, defendant is precluded from raising plaintiffs' failure to mediate as an affirmative defense. The Purchase Contract is clear on this issue, any dispute "shall be submitted to mediation." As cited above, the law favors reasonable interpretations of contracts. To allow the plaintiffs to attempt mediation to avoid summary judgment after defendant had devoted time and money defending their suit is unreasonable. Although defendant is entitled to summary judgment on all issues because of the plaintiffs' failure to prove their claims, the district court was correct to grant defendant a summary judgment by reason of plaintiffs' failure to timely seek mediation.

Affirmed.